

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LISELOTTE DAVIS,                 :
      Plaintiff                  :

                      :

      v.                         :               CIVIL NO. AMD 98-2794

                      :

LOCKHEED MARTIN                  :
OPERATIONS SUPPORT, INC.,        :
      Defendant                  :

...o0o...

MEMORANDUM

The plaintiff, Liselotte H. Davis, suffers from disabling entrapment of the ilioinguinal

and genitofemoral nerves, which causes her pain in the groin and upper thigh. She worked

for defendant Lockheed Martin Operations Support, Inc. ("Lockheed") as a manager of

computer software systems support from approximately May 1990 until October 1996, when

Lockheed terminated her employment. She alleges claims under the Americans with

Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and Title VII of the Civil

Rights Act of 1964, ("Title VII"), 42 U.S.C. § 2000e *et seq.*

Specifically, Davis alleges that beginning in early April 1996, when she was told by

her doctor that she could return to work after surgery and a short term disability leave, she

requested that Lockheed allow her to work a flexible schedule from home and attend office

meetings once a week as a reasonable accommodation to her disabling condition. In the

alternative, Davis eventually requested, in August 1996, that she be transferred to a position

which would allow her to work from home on a flexible schedule with only weekly office

meetings.

Lockheed determined that her position at the time required her to be at the office during regular office hours, and that there were no alternative positions for someone of her skills and grade which would allow her to work home on a flexible schedule with only weekly office meetings. Lockheed allowed her to work part-time for six weeks, but demanded that she work 40 hour weeks at the office thereafter. Davis attempted to work the part-time six week schedule, but found that the commute to work and the stress of the workplace exacerbated her condition, despite Lockheed's providing her with ergonomic office furniture and a cot for reclining in her office. At the close of the six week period, she ceased attending work and was thereafter terminated.

Davis claims that Lockheed thus denied her reasonable accommodation for her disability and wrongfully terminated her in violation of the ADA. In addition, she claims that similarly situated male employees were reasonably accommodated by flexible home work schedules, and thus Lockheed discriminated against her because of her sex in violation of Title VII. Davis requests a jury trial and seeks back pay, front pay, benefits, liquidated damages, and attorney's fees and costs.

Pending before the court is Lockheed's motion for summary judgment. The issues have been fully briefed and no hearing is necessary. I have considered the parties' arguments, memoranda and exhibits. For the reasons stated below, I shall grant summary judgment to Lockheed on all counts of the complaint.

(i)

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248-49. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). *See Celotex Corp.*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252; *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991). Of course, the facts, as well as the justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-

88 (1986).    The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

(ii)

Accepting Davis's account of the facts as true wherever her version of events differs from that relied on by Lockheed, the following is the factual context of the case. Davis began working for Lockheed in 1990 as a consultant on the Social Security Program. She was promoted to Technical Area Manager in December 1992. On October 26, 1993, Davis took a short term disability leave in order to have surgery to repair a hernia. She returned to work with her doctor's approval on November 29, 1993, and resumed her full responsibilities as Technical Area Manager. In October 1994, Lockheed reorganized and Davis's title was changed to Technical Area Specialist, which was a Manager I position in the Lockheed hierarchy. On November 17, 1995, Davis began another leave of absence in order to undergo a second hernia operation. Following surgery she went on an extended medical leave of absence and received short term disability payments from MetLife, Lockheed's insurance carrier, until February 21, 1996, when her benefits were terminated. During this period, Davis provided some work support from home to Arlene Nussbaum, the Lockheed employee assigned to take over Davis's responsibilities during her medical leave.

When Davis disputed the disability benefits termination, her insurer, MetLife, agreed to continue the benefits and requested that she undergo an Independent Medical Examination

by Dr. Joseph Jamaris. Dr. Jamaris concluded on March 29, 1996, that despite ongoing physical limitations related to her disability, Davis could return to work. Davis's benefits were then terminated. Lockheed wrote to Davis on April 5, telling her that she must return to work by April 8, 1996, or be terminated, because MetLife had concluded that her disability did not require her to be absent from work.

Davis had her neurosurgeon, Dr. Reginald Davis, conduct an examination on April 4, 1996. Dr. Davis told her that she could return to work with accommodations to minimize sitting (including while driving), and stress. Dr. Davis communicated his conclusions to MetLife. Despite her doctor's contrary conclusion, Davis wrote back to Lockheed on April 5th requesting that she be permitted to work from home, and explaining that she planned to appeal the termination of disability benefits in part because of a "discrepancy between my doctor and [MetLife's] doctor." She also stated that her "neurosurgeon is of the opinion that continued aggravation of the nerve will lead to a reoccurrence of the entrapment problem and therefore prohibit my recovery," and for this reason she needs to work at home. Davis did not return to work. She asked repeatedly to be allowed to work at home. On May 10, 1996, Davis sent Lockheed a copy of a letter from Dr. Davis stating, "[c]ontinued aggravation of this nerve will hamper your eventual recovery. As such, I concur with any temporary arrangements which could be made to allow you to work at home, thereby minimizing trauma to this nerve . . . ." Dr. Davis also stated that "your full recovery to date cannot be accurately predicted, however, there will be ongoing assessment as to when you have

sufficiently recovered to return to full duty."

On May 16, 1996, Dr. Davis spoke to Davis and to MetLife representative Mary Sylvester and informed them both that Davis could return to work with accommodations for her inability to sit for extended periods and for her need to avoid stressful situations. On May 22, Dr. Davis wrote Davis a letter "clarify[ing] statements made during your recent telephone conversation with Mary Sylvester." He reiterated that she had ongoing nerve irritation which "causes discomfort and as such limits your ability to sit for long periods of time." "In this regard," he continued, "accommodations could be made for you to sit for that period of time in which you are able and to change position or even lie down when necessary."

On that same day, representatives from Lockheed spoke with Davis via conference call and denied her request to work at home, but offered her a six-week part-time schedule to allow her a gradual return to the office environment. Lockheed also agreed to provide her with ergonomic furniture and a cot for reclining in her office. Ms. Davis hired a driver and returned to work on June 6, 1996, working initially a three day work week, until June 20th, when she was to begin a four day work week. Her prior responsibilities having been reassigned to Nussbaum, Davis began work at her same grade and same salary as a Technical Area Specialist on a different project run by Lockheed task manager Dr. Yateesh Katyal. Though the record is not entirely clear, Davis did not consistently attend work the number of days she was to attend each week under the ramp up schedule. Lockheed extended the

period for part-time work by several weeks.

On July 21, 1996, Davis's acupuncturist wrote Dr. Davis a letter explaining that her return to work had caused her condition to deteriorate. He recommended that she work at home. Dr. Davis examined Davis again on July 25th and wrote that he "concurs with her acupuncturist that you would be well-suited to work at home." Nevertheless, Dr. Davis did not prohibit or restrict Davis from working at the office, and directed only that Davis's work environment accommodate her inability to sit. Dr. Davis sent this letter to Lockheed on August 8, 1996.

Davis continued to request that she be permitted to work at home, and Lockheed continued to deny this request, explaining that her presence was needed to visit the client site, at staff meetings, and generally to accomplish the work on the Katyal project to which she had been assigned.

On August 15, 1996, Lockheed told Davis that pursuant to their previously agreed upon ramp-up back to work schedule, she should be working 40 hours a week and that her assignment on Dr. Katyal's project required her to be present in the office. A week later, Davis requested again that she be allowed to work at home. Lockheed responded that Dr. Katyal had determined "that no work assignments on his task order . . . could accommodate a home work environment." Davis thereafter was absent from work.

Over the next six weeks, Davis had a series of communications with the Program Director of Lockheed, Michael Paxton, in which she stated that she needed to work at home,

with permission to come to the office one day a week for meetings. Paxton explained that her

present assignment did not allow homework, and that he had conducted a survey of openings

at Lockheed and that no alternative assignments were available that would permit her the

schedule she requested. On October 2, 1996, Paxton wrote to Davis explaining that she had

three options: (1) return to work, at work, on a full-time basis; (2) return to work, at work,

on a part-time basis "which is mutually acceptable to you and the company"; and (3) resign.

Davis was terminated later that month.

On February 14, 1997, Dr. Davis completed a form for Davis for the Maryland Office

of Unemployment Insurance. He stated that Davis had been capable of full time work since

June 6, 1996, and that she was presently capable of full time work with certain restrictions.

The restrictions Dr. Davis listed were that Davis "could work keyboard from kneeling

position or Balans chair; that [she] cannot tolerate right hip flexion past 20. The patient

cannot sit in an auto for transportation, would need time off for treatment and has limited and

variable endurance, limited by pain." Dr. Davis has never directed that plaintiff needed to

work from home.

(iii)

Reading her complaint liberally, Davis alleges that she was terminated because of her

disability when Lockheed demanded that she be present in the office 40 hours per week when

she was physically incapable of doing so. She contends that Lockheed refused to accord her

the reasonable accommodation of working at home on a flexible schedule and attending only

-8-

weekly meetings, and instead terminated her for absence from the workplace in contravention of the ADA. However, Davis has not produced evidence that she ever adequately informed Lockheed that her disability required her to work at home on a flexible time schedule. Thus, there is no factual dispute about whether Lockheed denied her a reasonable accommodation, because she has not submitted sufficient evidence to show that Lockheed knew that her disability necessitated the accommodation she requested. There is no dispute that Lockheed provided her with all of the accommodations which her own doctor recommended. While she stated repeatedly to Lockheed that she believed she needed to work at home at irregular hours, her own subjective belief, when unsupported by her own doctor, is insufficient to put Lockheed on notice that she required such an accommodation. In any event, Lockheed has projected evidence, which Davis has not countered, to show that the essential functions of Davis's position required her presence at the office during office hours. Thus, by insisting that she could not be present at the office, Davis essentially admits that she is not "otherwise qualified" for her position as technical area specialist, with or without reasonable accommodation. Accordingly, I shall grant summary judgment to Lockheed.

Under the ADA a qualified individual with a disability is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §12111(8). *See* 29 C.F.R. § 1630.2(m). For the purposes of this motion, it is undisputed that Davis is an "individual with a disability."

The ADA forbids only a failure to accommodate "the known physical . . . limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). The plaintiff bears the initial burden of informing her employer what type of accommodations will permit her to perform her job. *Bryant v. Better Bus. Bureau of Greater Md.*, 923 F. Supp. 720, 737 (D. Md. 1996); *see Tyndall v. National Educ. Ctrs. Inc. of Cal.*, 31 F.3d 209 (4th Cir. 1994); *Gaines v. Runyon*, 107 F.3d 1171, 1175 (6th Cir. 1997)(plaintiff must establish that "an accommodation was needed, i.e., a causal relationship existed between the disability and the request for accommodation."). *See also* 29 C.F.R. § 1630.9, at 414 (Appendix: Interpretive Guidance)("In general . . . it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.").

As I observed in *Bryant*, "in some instances the proper accommodation will be so obvious that no further inquiry is necessary." 923 F. Supp. at 737. Nonetheless, in those circumstances where it is not obvious, the EEOC advocates a "flexible interactive process that involves both the employer and the qualified individual with a disability." *Id.* Of course, not all such discussions will entail consultation with medical authorities about the nature of the limitations which the disability imposes. However, where as here, the individual with a disability presents her employer with a report from her own doctor attesting to those limitations, the employer is not required to disregard that report and rely instead upon the subjective belief of the individual about what her limitations are. *Gaines*, 107 F.3d at 1176 (doctors' reports that plaintiff could drive truck so long as his hours remained stable

-10-

contradicted his request to drive only on day shift as an accommodation for epilepsy). *See White v. York Int'l Corp.*, 45 F.3d 357, 362 (10th Cir. 1995)(summary judgment for employer proper when plaintiff's subjective belief that he could perform job was countered by affirmative evidence that his physical limitations prevented him from performing job).

Davis's own doctor never stated that she was restricted to working at home or that she could not work in the office. Davis's doctor approved her for full-time work, with accommodations for her inability to sit, on April 4, 1996. On May 10, 1996, Davis sent Lockheed a letter from Dr. Davis in which he wrote, "[c]ontinued aggravation of this nerve will hamper your eventual recovery. As such, I concur with any temporary arrangements which could be made to allow you to work at home, thereby minimizing trauma to this nerve . . . ." In response to this letter, on May 22, 1996, Lockheed representatives worked out with Davis a six week part-time schedule by which she would gradually increase her hours until she was back to a 40 hour week. Lockheed also agreed to install an ergonomic chair (to allow kneeling), an adjustable workstation and elevated computer table (to allow standing), and a cot (to allow reclining). Davis hired a driver and returned to work on June 6, 1996.

Dr. Davis examined Davis again on July 25, 1996, and wrote to Lockheed that he "concurs with her acupuncturist that you would be well-suited to work at home," but he did not prohibit or restrict her from working at the office, and directed only that Davis's work environment accommodate her inability to sit. After Davis failed to appear at work beginning on August 23, 1996, Lockheed terminated her in October. Thereafter, on February 14, 1997,

Dr. Davis prepared a report in which he stated that Davis was then capable of full time work and had been capable of full time work since June 6, 1996, with accommodations for her inability to sit, "her limited and variable endurance limited by pain" and her need for time off for treatment.[1]

While Davis claims that Lockheed failed to accommodate her disability, it is indisputable that the employer engaged in extensive communications with her about her disability over a protracted period of time, and provided her with every accommodation her doctor reported that she needed. *See also Stewart v. County of Brown*, 86 F.3d 107 (7th Cir. 1996)(fact that plaintiff continued to experience neck and back pain after employer responded to his requests to build platform for ergonimically correct chair and installed miniblinds to minimize glare did not mean that he was not reasonably accommodated). It might be true that her doctor was mistaken in his judgment about what Davis's capacities were; however, the ADA did not require Lockheed to disregard his medical opinions and grant Davis's unsupported requests to work from home at irregular hours, attending meetings at the office only once each week. Employers are not required to give employees with a disability *any* accommodation they request; they are only required to provide a *reasonable accommodation. See Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir. 1998); *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996). As a matter of law, it was reasonable for Lockheed to give Davis the accommodations her doctor recommended.

---

[1]Davis makes no allegation that Lockheed denied any requests for time to seek treatment.

In any event, though this is a closer question, Lockheed is also entitled to summary judgment because Davis has failed to offer evidence to dispute Lockheed's evidence that she was not a "qualified individual" with a disability because she could not perform "the essential functions" of her position from home with weekly office meetings. 42 U.S.C. §12111(8). As the Fourth Circuit has held, "[e]xcept in the unusual case where an employee can effectively perform all work-related duties at home . . . ," attendance at the work site is presumed to be an essential function of a job.[2] *Tyndall v. National Educ. Ctrs. Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994). The plaintiff bears the burden of establishing that this presumption should not apply. *Id.*

Davis offers evidence that she could perform the functions of the position she held before her disability leave in November 1995; however, that position was reassigned in her absence and was not open at the time of her return.[3] Instead she was assigned as a Technical

---

[2]Davis offers some evidence that in 1999 Lockheed had begun a pilot program of telecommuting for some employees. However, there is no evidence that any Lockheed employees were telecommuting in 1996, the time period relevant to this case, and the evidence about telecommuting in 1999 does not indicate that anyone in a management position like Davis's is currently telecommuting. Certainly, as employers increase their reliance on telecommuting, working at home will often be a reasonable accommodation for employees with disabilities. However, the ADA does not require an employer to allow an employee to telecommute when no comparable employee does so, and when the essential functions of that employee's position require her presence in the office. Employers do not risk liability for discrimination when they decline to take "cutting edge" approaches to workplace innovations.

[3]Davis asserts that her replacement had obtained a promotion when taking over Davis's role on the project, and that her former lower level "Analyst" position remained open at the time of her return to work. However, Davis offers no evidence that she ever requested (while still employed at Lockheed) that she be demoted in order to find an alternative position for her, and

(continued...)

Area Specialist to work on a different project under Dr. Katyal. Accepting as true her

assertion that this position required no more than one office meeting per week, she has not

projected evidence that disputes Lockheed's evidence that her work with Dr. Katyal required

her to be present at the office. As indicated on her performance appraisal forms for the years

when she held the position of Technical Area Specialist, this position required Davis to

"provide technical guidance and support to subordinate team members in the performance

of task order activities," and to "[f]unction as a senior technical member as necessary to

ensure overall thoroughness and accuracy of all deliverables..." A Technical Area Specialist

was also to "[e]stablish open communications with SSA task managers on all assigned task

orders to ensure that expectations are successfully managed consistent with planned task

order activities," and to "[p]rovide timely and accurate progress status to internal

management on all on-going task/work orders with emphasis on problems, issues, and

concerns."

Lockheed presented evidence through deposition testimony and documents that

Davis's new assignment under Dr. Katyal, even more than ordinary projects, required its

senior staff, of which Davis was part, to be present at the office. Lockheed presented

evidence that this project involved developing an architecture and strategy plan to support

---

[3](...continued)
indeed, her complaint alleges that her "demotion" from "task manager" to "senior analyst" was
an act of discrimination. Complaint ¶ 10. It is unclear from the wording of the complaint when
this demotion is alleged to have taken place, and this claim is nowhere mentioned in Davis's
response to the summary judgment motion. Therefore, it is deemed withdrawn.

the migration of the Social Security Administration's ("SSA") information processing systems from a main frame environment to a client server strategy. This project required senior Lockheed staff, like Davis, to interact frequently with senior SSA staff to determine what they would require of their new system. These interactions occurred during weekly workgroup meetings between up to twenty senior SSA personnel and the Lockheed project staff, and they occurred in unplanned meetings as well. Dr. Katyal explained in a memorandum on August 28, 1996, that "a work at home environment (while not permitted on the program in general) is not acceptable for this task . . . [because it] does not facilitate Lockheed Martin's attendance at the workgroups held at SSA nor does it facilitate the receipt, incorporation, and subsequent delivery of revised work products to the workgroup members in the prompt manner required." Clearly, this position relied upon group work involving sporadic "face time," both internally among Lockheed staff and between the Lockheed and SSA staffs.

Davis attempts to counter this evidence by asserting that she did not in fact attend any client meetings from June 28, 1996, until August 22, 1996, when she was working on the Katyal project. But she acknowledges that she was coming to the office only one to three times per week during this period. According to the ramp-up schedule she had agreed to, she was not required to attend the planned weekly client meetings or to be a full participant on Dr. Katyal's team until she had worked her way up to 40 hours a week at the office. When Paxton then told her on August 22, 1996, that she needed to live up to the ramp-up schedule

and be present at the office 40 hours a week thereafter, she ceased coming to work at all.

Davis asserts, and I assume to be true, that while following the schedule of only one to three days at the office, and from August 23rd through mid-September, she worked at home when she was not at the office on various Lockheed projects (not the main SSA mainframe to client server project), and that Katyal was pleased with her work. This contention does not advance Davis's claims. The fact that Lockheed sought to obtain some productivity from Davis while it engaged in extensive communications to attempt to secure her return as a fully participating employee at the office is more probative of its efforts to accommodate than the contrary. Finally, Davis does not address any of the other essential functions of her position that would require her presence in the office during regular office hours (guidance and technical support to subordinate staff, to function as a senior technical member as necessary to ensure overall thoroughness and accuracy of all deliverables, to establish open communications with SSA task managers to ensure that expectations are successfully managed consistent with planned task order activities, etc.).

The EEOC Enforcement Guidance concerning work at home supports Lockheed's contention. It states that "[a]n employer must modify its policy concerning where work is performed if such a change is needed as a reasonable accommodation." Enforcement Guidance (Item 33), 2 BNA ADA Manual 1401)("Enforcement Guidance"). As explained above, Davis never established that her disability necessitated work at home. The Guidance also contemplates that the essential functions of some jobs cannot be performed at home;

-16-

crucial to that judgment is consideration of "the employer's ability to adequately supervise the employee and the employee's need to work with certain equipment [and I would add, with certain people]. . . that cannot be replicated at home." *Id.* Lockheed has established it is entitled to this safe harbor as a matter of law.

Moreover, while Davis expresses "disbelief" that there were no available comparable positions at Lockheed that would have permitted her to work at home with only weekly meetings, she has proffered no evidence that there were such openings. On the other hand, Lockheed has projected deposition and documentary evidence that Lockheed reviewed available openings and determined that none would accommodate Davis's request to work at home.

For all of these reasons, I am persuaded that there is no dispute of fact that Lockheed accorded Davis the reasonable accommodation that it knew her disability required. Moreover, I am persuaded that no reasonable juror could conclude by a preponderance of the evidence that Davis could perform the essential functions of her position if she worked exclusively at home. Thus, as a matter of law, Davis was not a "qualified person with a disability."

(iv)

I will also grant Lockheed's motion for summary judgment as to Davis's Title VII gender discrimination claim. Davis claims that a similarly situated male employee with a disability was reasonably accommodated by a flexible home work schedule, whereas she

was not. Thus, she contends Lockheed discriminated against her because of her sex in violation of Title VII. Lockheed is entitled to summary judgment on this claim because, as explained above, Davis failed to raise a factual issue that Lockheed failed to reasonably accommodate her. Consequently, whether Lockheed reasonably (even if differently) accommodated a male employee is immaterial.

In addition, Lockheed is entitled to summary judgment on the Title VII claim because the male employee with whom Davis compares herself, Richard Rose, was not similarly situated. As a result, even if Lockheed failed to accord Davis reasonable accommodation when it refused to allow her to work at home full-time for an indefinite period, the fact that Rose was accommodated does not show sex discrimination.

Rose periodically suffered from migraine headaches. He provided a doctor's report to Lockheed explaining that he could not work for up to sixteen hours following a migraine episode. As an accommodation to this disability, Lockheed allowed Rose to make-up work hours lost due to headaches, during the weekends or evenings. Even taking as true Davis's allegation that Rose sometimes worked at home, there is no dispute in the record that Rose generally conducted his work at the office and that he never requested to work full-time at home for an indefinite period as an accommodation for his medical condition. Moreover, it is uncontested that Rose held the position of Senior Computer Programmer and as such he frequently worked independently. Rose, unlike Davis, was not responsible for task management or workgroup support, functions that regularly required teamwork and ready

availability to other Lockheed and SSA employees.[4]  Accordingly, Davis has not brought

forth any evidence to show that she was treated less favorably than similarly situated males;

thus, summary judgment is appropriate as to her sex discrimination claim.

(v)

For the reasons discussed above, I shall grant Lockheed's motion for summary

judgment.  A separate order follows.


Filed: February 29, 2000

ANDRE M. DAVIS
United States District Judge

---

[4]Davis also includes an affidavit from Marv Kleinfelter. Kleinfelter is a Senior Analyst
who is allowed to work on weekends to make up lost time during the week. His affidavit lacks
probative value, not only because he is not disabled and does not hold a management position,
but also because he does not state that he works at home full-time indefinitely, or even that he
works at home at all. Similarly, Davis's comparison to Craig Ellerbroeck is unavailing.
Ellerbroeck was a full time employee of a different Lockheed Company than Davis. He was
retained to consult on the SSA Program through an intercompany transfer agreement. To perform
his consulting function, he attended meetings at Davis's worksite and at SSA, but he otherwise
worked out of his normal place of employment in Lanham, Maryland. There is no evidence
before this court to suggest that Ellerbroeck ever worked at home full-time or otherwise.